# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA

V.

NAJEE C. MOORE(xx/x/1990),
    a/k/a "Finesse," "Ness"
DESIRAE J. CASAREZ (xx/xx/1992)
    a/k/a "Desi," "Isis,"

## CRIMINAL COMPLAINT

CASE No.: 13-M-462

I, Shaughna B. Loncar, the undersigned complainant, being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about the below-listed dates, in the State and Eastern District of Wisconsin and elsewhere, Najee C. Moore and Desirae J. Casarez, the defendants herein, engaged in the following conduct:

**Please see Counts One through Seven set forth in Attachment A.**

I further state that I am a Special Agent with the Federal Bureau of Investigation, and this complaint is based on the following facts:

**Please see the attached affidavit of Special Agent Shaugna B. Loncar.**

Continued on the attached sheet and made a part hereof:   <u>X</u> Yes   <u>  </u> No

<u>                    </u>
Signature of Complainant
Shaughna B. Loncar

Sworn to before me and subscribed in my presence,

<u>    April 23rd 2013    </u>           <u>    </u> at Milwaukee, Wisconsin
Date                                             City and State

The Honorable WILLIAM E. CALLAHAN, JR.
<u>United States Magistrate Judge</u>                         
**Name & Title of Judicial Officer**               Signature of Judicial Officer

**Attachment A to Criminal Complaint**

**Count One (Conspiracy to Engage in Sex Trafficking of a Minor)**

Beginning on or about August 19, 2012, and continuing through on or about August 22, 2012, in the Eastern District of Wisconsin and elsewhere, the defendants, NAJEE C. MOORE and DESIRAE J. CASAREZ did conspire with one another and others, in and affecting interstate commerce, to recruit, entice, harbor, transport, provide, obtain and maintain JV-1 (juvenile victim hereinafter referred to as "JV-1"), a female who was then 16 years old, having had a reasonable opportunity to observe JV-1, and knowing and in reckless disregard of the fact that JV-1 had not attained the age of 18 years and would be caused to engage in a commercial sex act, and knowing and in reckless disregard of the fact that means of force, threats of force, fraud, and coercion, and a combination of such means, would be used to cause JV-1 to engage in a commercial sex act; and attempted to do so.

All in violation of Title 18, United States Code, Sections 1591(a)(1) and 1594(c).

**Count Two (Sex Trafficking of a Minor and by Force, Fraud and Coercion)**

Beginning on or about August 19, 2012 and continuing until on or about August 22, 2012, in the Eastern District of Wisconsin and elsewhere, the defendants, NAJEE C. MOORE and DESIRAE J. CASAREZ, aiding and abetting one another and others, in and affecting interstate commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, and maintained, JV-1 (juvenile victim hereinafter referred to as "JV-1"), a female who was then 16 years old, having had a reasonable opportunity to observe JV-1, and knowing and in reckless disregard of the fact that JV-1 had not attained the age of 18 years and would be caused to engage in a commercial sex act, and knowing and in reckless disregard of the fact that means of force, threats of force fraud, and coercion, and a combination of such mean, would be used to cause JV-1 to engage in a commercial sex act; and attempted to do so.

All in violation of Title 18, United States Code, Sections 2, 1591(a)(1); 1591(b)(1), 1591(b)(2), and 1594(a).

**Count Three (Sex Trafficking by Force, Fraud and Coercion)**

Beginning on or about August 19, 2012, in the Eastern District of Wisconsin and elsewhere, the defendants, NAJEE C. MOORE and DESIRAE J. CASAREZ, aiding and abetting one another and others, in and affecting interstate commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, and maintained, AV-1 (adult victim hereinafter referred to as "AV-1"), an adult female, knowing and in reckless disregard of the fact that means of force, threats of force, fraud, and coercion, and a combination of such means, would be used and were used to cause AV-1 to engage in a commercial sex act; and attempted to do so.

All in violation of Tile 18 United States Code, Sections 2, 1591(a)(1), 1591(b)(1), and 1594(a).

**Count Four (Conspiracy to Engage in Sex Trafficking)**

Beginning on or about January 2, 2013 and continuing until on or about January 4, 2013, in the Eastern District of Wisconsin and elsewhere, the defendants, NAJEE C. MOORE and DESIRAE J. CASAREZ did conspire with one another and others, in and affecting interstate commerce to

recruit, entice, harbor, transport, provide, obtain, and maintain (adult victim hereinafter referred to as "AV-2") knowing ,and in reckless disregard of the fact that means of force, threats of force, fraud, and coercion, and a combination of such means, would be used to cause AV-2 to engage in commercial sex acts, a violation of Title18 United States Code, Section 1591(a)(1).

All in violation of Title 18 United States Code, Sections 1591(a)(1) and 1594(c).

**Count Five (Sex Trafficking by Force, Fraud and Coercion)**

Beginning on or about January 2, 2013 and continuing until on or about January 4, 2013, in the Eastern District of Wisconsin and elsewhere, the defendants, NAJEE C. MOORE and DESIRAE J. CASAREZ, aiding and abetting one another and others, in and affecting interstate commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, and maintained, (adult victim hereinafter referred to as "AV-2"), an adult female, knowing and in reckless disregard of the fact that means of force, threats of force, fraud, and coercion, and a combination of such means, would be used and were used to cause AV-2 to engage in a commercial sex act; and attempted to do so.

All in violation of Tile 18 United States Code, Sections 2, 1591(a)(1), 1591(b)(1), and 1594(a).

**Count Six (Interstate Transportation in Aid of Unlawful Activity (Prostitution))**

Beginning on or about January 2, 2013 and continuing until on or about January 3, 2013, in the Eastern District of Wisconsin and elsewhere, the defendants, NAJEE C. MOORE and DESIRAE J. CASAREZ, did travel in interstate commerce with intent to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of any unlawful activity and thereafter performed and attempted to perform such act.

All in violation of Title 18, United States Code, Section 1952(a).

**Count Seven (Forced Labor)**

Beginning on or about January 2, 2013 and continuing through on or about January 4, 2013, in the Eastern District of Wisconsin and elsewhere, the defendants, NAJEE C. MOORE and DESIRAE J. CASAREZ, aiding and abetting each other, did knowingly provide and obtain the labor and services of (adult victim hereinafter referred to as "AV-2") by any one of, and by any combination of the following means:

(1) by means of force, threats of force, physical restraint and threats of physical restraint to AV-2; and

(2) by means of serious harm and threats of serious harm to AV-2; and

(3) by means of any scheme, plan and pattern intended to cause AV-2 to believe that if she did not perform such labor or services, that AV-2 would suffer harm and physical restraint; and attempted to do so.

All in violation of Title 18, United States Code, Sections 2, 1589(a), and 1594(a).

**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT**

I, Shaughna B. Loncar, being duly sworn, depose and state as follows:

**INTRODUCTION**

1.      I am a Special Agent with the Federal Bureau of Investigation [hereinafter "FBI"] and am presently assigned to the Milwaukee Division of the FBI. I have been employed by the FBI as a Special Agent since May 2011. I am assigned to the violent crimes against children and civil rights squad. I am also a member of the Human Trafficking Task Force for the Eastern District of Wisconsin, which investigates the illegal trafficking of persons both domestic and foreign for the purposes of labor and commercial sex acts. I have participated in investigations involving commercial sex trafficking, which include numerous interviews with individuals involved in prostitution. I am familiar with the street terms associated with prostitution and sex trafficking. I know through my training and experience that the internet website www.backpage.com is often used by individuals in the sex-trafficking trade to advertise the services of individuals involved in prostitution.

2.      I am an "investigative or law enforcement officer" of the United States within the meaning of 18 U.S.C § 2510(7), that is, an officer of the United States who is empowered by the law to conduct investigations of and to make arrests for the offenses enumerated in 18 U.S.C. § 2516.

3. This Affidavit is in support of a criminal complaint charging NAJEE C. MOORE [hereinafter "Moore"], also known as FINESSE (ph) and NESS, date of birth December 13, 1990, and DESIRAE J. CASAREZ [hereinafter "Casarez"], also known as DESI and ISIS, date of birth December 16, 1992, with various sex-trafficking offenses in violation of federal criminal law. This Affidavit is based upon my personal knowledge and upon information reported to me by other local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable. The investigation has involved law enforcement officers and others from the FBI, the Milwaukee Police Department [hereinafter "MPD"], Wisconsin Department of Justice Division of Criminal Investigation [hereinafter "DCI"], and the United States Attorney's Office.

**FEDERAL SEX-TRAFFICKING STATUTE – 18 U.S.C. §1591, 1594, and 1952**

4. Based on my training, experience and the facts set forth in this Affidavit, there is probable cause to believe that the following statutes have been violated by Moore and Casarez:

5. 18 U.S.C. §1591, entitled, "Sex trafficking of children or by force, fraud, or coercion," provides in relevant part:

(a) Whoever knowingly—

(1) in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, recruits, entices, harbors, transports, provides, obtains, or maintains by any means a person; or

(2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1), knowing, or in reckless disregard of the fact, that means of force, threats of force, fraud, coercion

2

described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b).

(c) In a prosecution under subsection (a)(1) in which the defendant had a reasonable opportunity to observe the person so recruited, enticed, harbored, transported, provided, obtained or maintained, the Government need not prove that the defendant knew that the person had not attained the age of 18 years.

6. 18 U.S.C. § 1594, entitled, "General provisions," provides in relevant part:

(a) Whoever attempts to violate section 1581, 1583, 1584, 1589, 1590, or 1591 [18 U.S.C. § 1581, 1583, 1584, 1589, 1590, or 1591] shall be punishable in the same manner as a completed violation of that section.

(c) Whoever conspires with another to violate section 1591 [18 U.S.C. § 1591] shall be fined under this title, imprisoned for any term of years or life, or both.

7. 18 U.S.C. §1952, entitled, "Interstate and foreign travel or transportation in aid of racketeering enterprises," provides in relevant part:

(a) Whoever travels in interstate or foreign commerce…with intent to—

(2) ….further any unlawful activity; or

(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and thereafter performs or attempts to perform—

3

(b) As used in this section (i) "unlawful activity" means

(1) ....or prostitution offenses in violation of the laws of the State in which they are committed or of the United States,

## DEFINITIONS AND ROLES OF THE DEFENDANTS

8.    Based on my training and experience as well as consultation with other law enforcement officers involved in sex trafficking investigations, I am familiar with the following terms and definitions:

a.    PIMP:  Term used to describe a person who persuades, compels, entices, etc., a female to become a prostitute or to continue to commit acts of prostitution.  Often, the pimp will require his/her prostitutes to call him, "Daddy" (See paragraphs 16, 17, 19, 32, 57(a), 59(e)).  The pimp will usually take all of the money from his/her prostitutes, and s/he will commonly have several girls working for him/her.  The pimp will usually have no legitimate source of income.  During the examination of cellular telephones in this investigation, there were text messages exchanged which indicated that "Finess" was a pimp (See paragraph 59(a)-(d)).

b.    BOTTOM:  Term used to describe a pimp's main prostitute. The "bottom" is usually a prostitute who has been with the pimp the longest or who is the most trusted prostitute.  She is usually the recruiter for the pimp and has the task of training females to be prostituted.  The bottom often supervises the other prostitutes; often reports any rule violations; often collects money for the pimp; and often helps the pimp inflict punishment on the violators.  The bottom is generally allowed to sit in the front seat with her pimp and all the prostitutes are

4

aware that she is the bottom. During this investigation, there were multiple times, in which Casarez was observed sitting in the front seat with Moore (See paragraphs 20, 24, 33, 36). In addition, Casarez introduced Adult Victims 1 and 2 [referred to as "AV-1" and "AV-2" herein] to Moore.

    c.   STABLE: Term used to describe a group of prostitutes working for a particular pimp. For example, if a pimp had six girls working for him, it could be said that he has a stable of six.

    d.   THE RULES: Those who are prostituted in the stable by a particular pimp are usually required to follow all of the pimp's rules. The pimp often decides the rules and can change them at any point. Failure to follow the rules may result in discipline or punishment, as determined by the pimp. During this investigation, a brown notebook with a pink floral pattern on the cover was located in Casarez's bedroom. In the notebook, there were multiple pages, which were titled, "Rules and Regulations" (See paragraph 53).

## ELECTRONIC DEVICES AND INTERNET WEBSITES

    9.    Based on my training and experience as well as consultation with other law enforcement officers involved in sex trafficking investigations, I know that:

    a.   Pimps and bottoms commonly take the photographs for the prostitution advertisements on cameras, cellular telephones, and other electronic devices. These photographs can then be uploaded directly to the Internet, or transferred to another electronic medium. Pimps and bottoms frequently retain photographs of current and former prostitutes, on electronic devices.

b. Pimps and bottoms also frequently utilize cellular telephones to direct prostitutes in the commercial sex trade, through direct conversation and text messaging. These instructions commonly include when and where to work, and instructions regarding charges for particular services. Pimps and bottoms commonly retain contact information of current and former prostitutes on cellular telephones as well as exchanged text messages.

c. Pimps and bottoms often utilize an Internet website called www.backpage.com [hereinafter "Backpage"] to post advertisements, which are used to facilitate an exchange of money for sexual acts. These advertisements often contain partially nude photographs of women, the women's physical description, "services" offered (i.e. massage or two girl specials), availability, and contact information (i.e. telephone number, e-mail address or personal website).

## DYNAMICS OF THEPIMP-PROSTITUTE RELATIONSHIP

10. Based on my training and experience as well as consultation with other law enforcement officers involved in sex trafficking investigations, I know that pimps often use techniques to recruit juveniles and young women to prostitute including, but not limited to, the following:

a. Pimps often identify vulnerable victims including, but not limited to, juveniles, and run-aways, whom the pimp believes s/he can coerce to prostitute.

b. Once identified, a pimp will often use a grooming process to train his/her victims to follow his/her rules. As such, the victims will often first work for the pimp as an exotic dancer and then as a prostitute and are usually required to provide the

6

pimp with the proceeds received in exchange from dancing as well as for sexual acts (see paragraph 31).

c. The pimps may try to increase the victim's physical and psychological isolation by playing to the victim's feelings of abandonment. The pimp may insert him/herself into the victim's life and attempt to exploit their needs and insecurities, which may be emotional or financial. Once the relationship has been established, the pimp often transitions into imposing prostitution as a condition of continuing the emotional and financial relationship.

d. Eventually, the pimp often seeks to convince the victim that she "belongs" to the pimp, and must do as s/he says.

e. The grooming process often involves physical and mental abuse including, but not limited to, forced sexual acts, beatings, threats, and the denial of food and sleep. In addition, swift punishment may be handed out to victims who do not follow the "rules" outlined by the pimp and can include the threatening of or actual "trading" of the victim to another pimp (See paragraph 34).

f. Victims, despite the abuse or mistreatment, will often stay with their pimp and even minimize the culpability of their pimps.

g. Often, pimps will often use a bottom to help identify and recruit new victims to be prostitutes (See paragraphs 43-45). The bottoms will often assist the pimps with the following: training the victims on how to be a member of a pimp's stable; enforcing punishment; and collecting money (See paragraphs 17, 31, 32, 45).

Case 2:13-mj-00462-WEC   Filed 04/23/13   Page 10 of 30   Document 1

**AUGUST 22, 2012**

11.     On or about August 22, 2012, MPD conducted an undercover operation involving a sixteen year old female [hereinafter "JV-1"] at LaQuinta Hotel, located at 5442 N. Lovers Lane, Milwaukee, Wisconsin.

12.     A MPD Officer, in an undercover capacity [hereinafter "MPD Undercover Officer"], arranged to make a prostitution date with JV-1 via the cellular telephone number, 602-832-4999, provided in a Backpage advertisement, which was posted on Tuesday, August 21, 2012, at 11:38 p.m.

13.     The Backpage advertisement stated the following:  "Fun & ready to party!!!!! Kinky- 21 Discreet Fun Open minded And Kinky!!! I Will Help Fulfill ALL Your Needs!!! Tired of The Fakes No Fearr Sweetie My Pics Are Really ME! ;) 100%% Satisfaction Out Calls n In Calls!  6028324999 NO Lowballers!  No African Americans!  Mature Serious Inquiries Only!  ****DON'T Forget To Ask About The **2** Girl Special !!!!!***."  In addition, the advertisement included:  the "Poster's age:  21" and the "Location:  Milwaukee, Anywhere You Want Me!!"

14.     Pursuant to a subpoena, the advertisement was received from Backpage, and the invoices attached to the advertisement indicated invoice dates of August 20 and 21, 2012, as well as an email address of lovely.desi@ymail.com (See paragraph 61(a)-(e)).  I know that Casarez used the nickname, "Desi."

15.     I am aware that on or about August 22, 2012, the MPD Undercover Officer entered room 346 of LaQuinta Hotel, where the female photographed in the advertisement, also known as JV-1, offered a sexual act in exchange for money.  JV-1 wore a strapless red and black

8

bra and underwear. In the hotel room, JV-1 informed the MPD Undercover Officer that they were alone in the room and that a male and two girls just left in a black Magnum. JV-1 also stated to the MPD Undercover Officer that she gives the money from her "dates" to the man who just left. I am aware that "date" is a term used to describe the act of prostitution or the prostitution client.

16.    JV-1 was taken into custody for an outstanding warrant and JV-1 was interviewed by MPD Detective Lynda Stott at the Police Administration Building. The interview was video recorded and I reviewed the recording. Throughout the interview, JV-1 referred to Moore as "Daddy" and stated that "Daddy" got the hotel room and that she was staying in the hotel with "Daddy," Isis, and another female, who will be identified as AV-1 for the remainder of this Affidavit. I am aware that most pimps require that the prostitutes, who work for them, call them "Daddy." JV-1 identified a photograph of Moore to be "Daddy," and a photograph of Casarez to be "Isis."

17.    According to JV-1, Casarez used the white phone, which originally belonged to AV-1, and the black android telephone to post the advertisements on Backpage. JV-1 stated that Casarez first answered the telephone call from the undercover officer because she was in charge of the telephone. JV-1 also stated said that Moore, whom she called "Daddy," asked Casarez who the caller wanted and she said JV-1. Additionally, Casarez told JV-1 how much to charge when the prostitution date arrived at the hotel. I believe that Casarez's conduct was consistent with the conduct of a bottom, who was working under the direction of a pimp.

18.    During the interview, JV-1 said that she was at the hotel with the other three for approximately two and a half days. Over the course of the two and a half days, JV-1 did

approximately twelve prostitution dates but only had sex with approximately three of the individuals. The prostitution dates were mostly "out calls" with the exception of the undercover police officer, who was the first "in call." I know that an "in call" is when the prostitution act takes place wherever the prostitute is staying (i.e. residence, hotel room, etc.), and an "out call" is when the prostitute goes to meet the individual soliciting prostitution.

19.     In the interview, JV-1 said that she told the undercover officer that it was going to be three hundred "roses" for an hour. I am aware that prostitutes use the term "roses" when referring to dollars. In addition, JV-1 stated that the three hundred roses was the amount for regular sex, not oral or anal, and only one ejaculation. When asked who would get the money from the date, JV-1 replied that "Daddy" would get the money.

20.     I am also aware that on or about August 22, 2012, prior to and during the undercover operation in room 346, law enforcement conducted surveillance of the LaQuinta Hotel parking lot. Law enforcement observed a black male and two black females leave the hotel and enter a black Dodge Magnum in the hotel parking lot. The vehicle was observed as it left the hotel parking lot and drove to the vicinity of 5975 N. 113th Street, Milwaukee, Wisconsin, where MPD officers conducted a traffic stop of the 2005 black Dodge Magnum, Wisconsin license plate 887 THC. Moore was identified as the operator of the vehicle and the two passengers were identified as Casarez and AV-1. Casarez was seated in the front passenger seat and AV-1 was seated in the rear driver's side seat. I am aware that Sergeant Flowers received consent from Moore to search the vehicle and law enforcement recovered items from the vehicle including, but not limited to, the following: condoms, keys, a global positioning system (GPS), and multiple cellular telephones.

10

21.     MPD Detective Lynda Stott stated that she was aware consent was obtained from Moore to search hotel room 346. As a result, of the consent search, law enforcement recovered several condoms, KY lubricant, and clothing that appeared in the Backpage advertisement from room 346 at the LaQuinta Hotel.

22.     The Department of Transportation was queried for the vehicle, Wisconsin license plate 887 THC, which revealed the listed owner as Moore, date of birth December 13, 1990, address of 4048 N. 24th Place, #2, Milwaukee, Wisconsin 53209, with a VIN of 2D4FV48V95H607149.

23.     On August 22, 2012, MPD Detective Dineen determined from the General Manager of the LaQuinta Hotel that room 346 was rented by Moore on August 19, 2012. Moore extended the stay on a daily basis and the room was paid for with cash. The manager informed Detective Dineen that she knew that there were three females with Moore, one white female and two black females.

24.     After the traffic stop, MPD Detective Dineen conducted an interview of AV-1. AV-1 provided a cellular telephone number of 602-832-4999. AV-1 knew the driver of the vehicle, who was identified as Moore, to be "Ness," and the front seat passenger, who was identified as Casarez, to be "Adriana White." I know that Casarez has a sister named, Adriana White. AV-1 said that she had only been in Milwaukee for approximately two weeks and had been dancing on and off at the "Cheetah Club" in Milwaukee, Wisconsin. I am aware that the Cheetah Club is a Gentlemen's club in Milwaukee, Wisconsin. AV-1 was staying at the LaQuinta Hotel in room 346 with Casarez, Moore, and a white girl.

11

25.     During the interview, AV-1 informed law enforcement that she met Casarez around July 10, 2012, in Arizona while she was working at a McDonald's. AV-1 and Casarez discussed being exotic dancers together and danced at a club called "TD's" in Tucson, Arizona. I conducted an internet search of TD's in Tucson, Arizona and found that "TD's Showclubs" are "Tucson's premier Gentlemen's club." At approximately the end of July or beginning of August 2012, Casarez told AV-1 that they could make a lot more money dancing at the "Factory," a club in Chicago, Illinois. I am aware that the Factory is a Gentlemen's Club located in Chicago, Illinois. Thereafter, AV-1 and Casarez drove together from Arizona to Chicago and then to Milwaukee in Casarez's vehicle.

26.     Upon arriving in Chicago, Illinois, AV-1 and Casarez danced at the Factory. The first night that AV-1 danced at the Factory, she did not have to pay a "house fee;" however, each night thereafter she had to pay a fee of $125.00 in order to dance. One night AV-1 danced at the Factory, and did not make enough money to pay the house fee because it was very slow. As a result, the next time AV-1 danced at the Factory, she would have to pay the house fee up front.

27.     The following night, Casarez told AV-1 that she wanted to travel to Milwaukee, Wisconsin to visit her grandmother. AV-1 agreed to go to Milwaukee with Casarez. Casarez told AV-1 that she could make a lot of money dancing at the Cheetah Club. AV-1 auditioned and was hired to dance at the Cheetah Club. Casarez took AV-1 to the Cheetah Club to dance but Casarez said that she had to wait outside because she had family inside the club.

28.     Casarez picked AV-1 up after she finished dancing at the Cheetah Club. AV-1 stated that Casarez looked scared and disheveled and was no longer wearing a wig. Casarez told AV-1 that while she was dancing, Casarez ran into Moore at a nearby McDonald's. AV-1 was

12

aware of Moore because Casarez told AV-1 about her old boyfriend named, "Ness" while they were travelling. Casarez told AV-1 that Moore was at the McDonald's with his other girlfriend and Casarez almost fought that girlfriend.

29.     Casarez and AV-1 went to a nearby McDonald's to get something to eat; however, AV-1 never got anything to eat because they ran into Moore at McDonald's and he was still with another girl whom was described as Moore's girlfriend. AV-1 and Casarez followed Moore in his black Dodge Mangum to a house where he dropped the girlfriend off. After dropping off the girlfirend, Moore parked his car and got into Casarez's car with AV-1 and Casarez. Thereafter, they drove to the Diamond Inn.

30.     AV-1 informed law enforcement that Moore rented a room for the three of them to stay in at the Diamond Inn. AV-1 gave Moore $20.00 for her part of the room. At the Diamond Inn, Moore and Casarez were "hugged up" on the bed as if they were boyfriend and girlfriend. AV-1 stated that Moore and Casarez started having sex in front of AV-1. While they were having sex, Casarez started touching AV-1's breasts and tried to take her pants off. AV-1 felt uncomfortable because she did not know Moore and pushed Casarez away. AV-1 went in the bathroom and waited until they were done having sex.

31.     Additionally, AV-1 informed law enforcement that on or about August 10, 2012, Moore drove AV-1 and Casarez to Chicago, Illinois to dance at the Factory. AV-1 owed the Factory a "house fee" from the last time she danced at the club but did not have the money to pay up front. Moore gave AV-1 the $100.00 she needed in order to dance at the club. AV-1 made approximately $500.00 at the Factory that evening and gave Moore $100.00 that she borrowed earlier. While in the car with Moore, Casarez suggested that AV-1 give Moore all her money.

13

AV-1 stated that she felt very uncomfortable with Moore and Casarez, so she left the car to stay with a friend.

32.     AV-1 stayed with her friend for a short time before Casarez arrived to pick up AV-1. While AV-1 and Casarez were alone in an elevator, Casarez told AV-1 that she should give all her money to Moore and that he would get her everything she needs. AV-1 told Casarez she wanted to go home. Casarez told AV-1 that she only had $400.00 and that was not enough money to get back home. Casarez then tried to take AV-1's purse and AV-1 pulled her purse away from Casarez. Moore was waiting for Casarez and AV-1 outside and told them to get in the car and took them back to the hotel. At the hotel, Moore took AV-1 into the bathroom and closed the door. Moore asked AV-1 where the money was and AV-1 started to cry because she was afraid. Moore asked AV-1 what was wrong and AV-1 told Moore that she wanted to leave and go home. Moore told her "I need you." AV-1 began to cry harder and wanted to leave but she was afraid. Moore took AV-1's purse and took the $400.00 she made at the Factory out of the purse. AV-1 kept telling Moore that she wanted to go home. Casarez started to call Moore "Daddy" but AV-1 continued to call him "Ness." AV-1 stated that she was afraid of Moore and did not like him.

33.     On or about August 19, 2012, Moore, Casarez, and AV-1 went to the La Quinta Hotel, located at 5442 N. Lovers Lane, Milwaukee, Wisconsin, where Moore rented room 346. On or about Monday, August 20, 2012, Moore walked into the hotel room at the La Quinta with a white female, also known as JV-1. Moore told AV-1 and JV-1 to get in the car with him and Casarez. AV-1 and JV-1 sat in the back seat while Casarez sat in the front passenger seat. In the back seat of the car, AV-1 noticed that JV-1 looked very young. AV-1 asked JV-1 how old she was and JV-1 said 18 years old, but AV-1 did not believe her.

14

34. Moore then drove to a neighborhood and told AV-1 to get out of the car. AV-1 said that Moore was planning on "giving" her to another pimp. They went into a house, which was a duplex, and AV-1 saw a shotgun. AV-1 knew that the black male inside the duplex was a pimp because he told her that he was a pimp. AV-1 was terrified and begged Moore not to leave her there. Moore agreed to take her back because AV-1 was crying and trembling.

35. AV-1 informed law enforcement that she purchased the white iphone, telephone number of 602-832-4999, which was listed in the above-described Backpage advertisement. Casarez and Moore were using the cellular telephone, however, because AV-1 was not making enough money. According to AV-1, Moore and Casarez used her cellular telephone to take photographs that were used in advertisements on Backpage.

36. Following the traffic stop, which was conducted on August 22, 2012, Casarez, who was the front seat passenger in the vehicle, was taken into custody. Thereafter, Casarez was read her Miranda Rights and interviewed by MPD Detectives Lynda Stott and Thomas Dineen. Casarez provided her cellular telephone number of 623-204-9458, which she stated she stopped using approximately two months prior. Casarez provided her grandmother's address of 3869 N. 24th Place, Milwaukee, Wisconsin. Casarez said that AV-1's cellular telephone number was 602-832-4999, and 414-234-3435 was the cellular telephone number for Moore, who she also knew as "Finesse" (ph) and "Ness."

37. In the interview, Casarez said that she used AV-1's cellular telephone, 602-832-4999, to take photographs of JV-1. Moore instructed Casarez to take these photographs. Casarez said that Moore's cellular telephone, 414-234-3435, boost, touch screen, android, was

15

used to post advertisements on backpage.com. Moore also used his cellular telephone to take different photographs of JV-1.

38.     Casarez stated that she met Moore on or about February or March 2011, and became his girlfriend. Over time, Moore suggested that Casarez dance at strip clubs in order to make money. Moore drove Casarez to and from the strip clubs. Once Casarez got in the vehicle after she finished dancing, she gave all the money she earned to Moore. Casarez danced approximately four to five times per week and made approximately $300.00 to $500.00 per night.

39.     Casarez identified a photograph of Moore and a photograph of JV-1. In addition, Casarez said that JV-1 knew Casarez as Isis or Desi.

40.     I know that Moore was taken into custody on August 22, 2012. I reviewed the video recording of the interview of Moore conducted by MPD Detective Thomas Dineen. MPD Detective Dineen read Moore his Miranda Rights and asked whether he wanted to talk knowing those rights. Moore proceeded to ask what he was arrested for and MPD Detective Dineen replied pandering and trafficking of a child with regards to the incident at the hotel. Moore asked who the child was and MPD Detective Dineen stated that the child was the white girl they left in the hotel. Moore said he did not know her and thereafter refused to continue without an attorney.

41.     On or about August 27, 2012, Moore was charged by the Milwaukee County District Attorney's Office with one count of Trafficking of a Child and one count of Soliciting a Child for Prostitution. I know that on or about November 28, 2012, the State of Wisconsin dismissed the charges against Moore without prejudice and Moore was released from custody.

16

## JANUARY 2013

42.     On or about January 4, 2013, a female, who will be identified as AV-2 for the remainder of this Affidavit, flagged down MPD officers to report that she was being held against her will by a male and a female, who forced her to have sex with them.

43.     On or about January 4 and January 6, 2013, AV-2 was interviewed by MPD officers. I know that during these interviews AV-2 made the statements included below to law enforcement. AV-2 said that she met Casarez, who she knew to be "Isis," through her ex-boyfriend, who met Casarez while she was working as a stripper at the "Body Shop." I searched the internet and found that the Body Shop is a Gentlemen's club located in Rockford, Illinois.

44.     AV-2 said that on or about January 2, 2013, Casarez called AV-2 and asked her if she wanted to go to Milwaukee and AV-2 agreed to go. Casarez arrived at AV-2's house in a black Dodge Magnum. Moore, who AV-2 knew to be Fazell (ph), was the driver, an unidentified male sat in the front passenger seat, and Casarez sat in the rear driver's seat. They then traveled by car in interstate commerce from Illinois to Wisconsin. Once they arrived in Milwaukee, they dropped off the unidentified male and eventually arrived at 3869 N. 24th Place, Milwaukee, Wisconsin around midnight on January 3, 2013. AV-2 stated that the back exit door at 3869 N. 24th Place did not have a door knob and the front door had a double dead bolt without a key in the door.

45.     On January 3, 2013, Casarez and Moore began to ask AV-2 questions about how she earned money in the past. AV-2 said that she previously worked as a prostitute with her aunt in northern Illinois but no longer worked as a prostitute. Casarez asked AV-2 what she did with the money that she earned and AV-2 said that she spent the money on things she needed.

17

Casarez told AV-2 that they would manage any money she earned. Moore told AV-2 that she was going to "do this" and that she was going to audition with Casarez. AV-2 told them no and that she could not dance; however, most of the conversations with Casarez and Moore focused on making money.

46.     On January 3, 2013, after dinner, Casarez asked AV-2 to see her vagina, which made AV-2 uncomfortable. AV-2 began to unsuccessfully text friends on her cellular telephone for a ride so as to get away from Moore and Casarez. Moore and Casarez went into a bedroom while AV-2 stayed in the living room. AV-2 thought they were having sex because she could hear them. Casarez came out of the bedroom naked and asked AV-2 to join them multiple times. AV-2 thought they were trying to get her to have sex with them. AV-2 refused and continued to search for a ride. When Casarez came out of the bedroom again, AV-2 told her that she wanted to go home and asked if they would take her home or to the bus station. AV-2 went downstairs to get her clothes out of the dryer and when she came back Casarez was going through AV-2's purse. AV-2 became upset with Casarez and Moore attempted to calm AV-2 down.

47.     Moore tried to convince AV-2 to stay in Milwaukee and make money dancing with Casarez. AV-2 refused and repeated that she wanted to go home. AV-2 obtained a telephone number for a taxi company. AV-2 observed the mailing address on an envelope but she did not know if it was N. 24th or S. 24th. AV-2 asked Moore and he told her it was S. 24th rather than the actual address of N. 24th. Moore became upset with AV-2 and refused to let her leave. Moore told AV-2 that she was either going to give him all her money and he would take her to the bus station or she was not leaving. AV-2 attempted to call the police but Moore tried to take the phone away from her. Moore tried to grab AV-2 and she resisted and began to

scream. Moore covered her mouth with his hand and knocked her down. AV-2 tried to kick Moore off. Casarez remained in the bedroom the entire time.

48.     Moore asked AV-2 how much money she had and AV-2 informed him that she had $140.00. Moore asked for a $100.00 but AV-2 said that she would not have enough to pay for the bus and the cab from the bus station, if she gave him $100.00. Moore then asked for $80.00 and in exchange he would take her to the bus station. Thereafter, Moore took AV-2's bags to the car and would not let AV-2 take her bags because he thought she would run. Moore, Casarez, and AV-2 got in the car. On their way to the bus station, Moore parked under an overpass at approximately 11:00 p.m. and attempted to convince AV-2 to stay in Milwaukee and dance with Casarez. AV-2 refused and asked that he take her to the bus station. Moore told AV-2 to give him her phone because he wanted to see if there was anything on the phone that could get him in trouble. Moore saw the text messages that AV-2 sent to friends about being scared, uncomfortable, and that Casarez was trying to get her in bed with them. Moore became upset and told her that she was not going home and took AV-2 back to Casarez's home.

49.     When they arrived back at 3869 N. 24th Place, Casarez asked numerous times if she could give AV-2 oral sex and AV-2 said no; however, AV-2 was afraid and thought that she would be prevented from leaving unless she gave in. AV-2 eventually gave in and Casarez pulled AV-2's pants and underwear off. They were on the couch and Casarez was on top of AV-2. While Casarez gave AV-2 oral sex, Moore walked up to AV-2 with his penis out and put his penis in her mouth. AV-2 gave Moore oral sex for approximately one to two minutes. While Casarez was giving AV-2 oral sex, Moore pulled his penis out of AV-2's mouth and put on a condom. Moore then pulled off Casarez's pants and began to have penis to vagina sexual intercourse with her while Casarez continued to perform oral sex on AV-2.

19

50.     After a few minutes, Casarez straddled AV-2 and attempted to put her vagina on AV-2's face. AV-2 told her to stop and tried to push her off but Casarez continued. AV-2 continued to refuse to perform oral sex on Casarez but Moore told her that she was going to do it in a threatening manner. AV-2 continued to refuse but both Moore and Casarez told her that she was going to do it. Casarez sat on AV-2's face and Moore began to have penis to vagina sexual intercourse with AV-2. Moore turned AV-2 around and made her put her knees on the ground. Moore then performed another act of penis to vagina sexual intercourse on AV-2 from behind. Moore then pushed AV-2's head into Casarez's vagina and held it there. Casarez told Moore to "keep fucking that bitch." After a few minutes, Moore stopped and exited the room with Casarez.

51.     AV-2 went to the bathroom to shower to remove everything from her face, hair and body and then fell asleep on the couch. AV-2 woke up the next morning while Moore was going through her cellular telephone. Thereafter, Moore, Casarez, and AV-2 drove around running errands. AV-2 texted her step-father and friends to tell them that she was kidnapped and needed help. AV-2 sent the messages and then quickly deleted them in case Moore looked at her phone again. AV-2's step-father told her that the police were on the way. Moore pulled up to a house and AV-2 observed a police car nearby. As soon as Moore stopped the car, AV-2 exited the car, ran to the marked patrol car, and told the police that people were keeping her hostage. AV-2 tried to show the police the car but it was already gone. AV-2 identified photographs of Casarez and Moore. Based on my experience and the facts set forth herein, I believe that Casarez introduced AV-2 to Moore for the purpose of AV-2 making money for Moore through dancing, stripping, and ultimately prostitution.

52. On or about January 5, 2013, Casarez and Moore were arrested at 3869 N. 24th Place, Milwaukee, Wisconsin and remain in custody.

53. On or about January 5, 2013, a consent search was conducted at 3869 N. 24th Place, Milwaukee, Wisconsin, and a brown notebook with a pink floral pattern on the cover, which included numerous hand written notes, was recovered from Casarez's bedroom. An examination of the notebook revealed multiple listings for Gentlemen's clubs in Wisconsin, Arizona and Illinois. In addition, there was a section titled, "Rules and Regulations," which included the following:

   a. "Don't talk so much, especially to bitches/outsiders the more information I provide the **MORE** ppl have to play off of."

   b. "Fuck any and everything Get Money!"

   c. "Love my man with all my might & unconditionally"

   d. "Never ever talk about our business with NOBODY (JayZ & Beyonce)"

   e. "Do any or everything to the best of my ability * Finesse It!"

54. I believe that these rules were Moore's rules for Casarez based on their content and the reference to "Finesse," which Moore used as a nickname. In addition, I know that pimps often give their prostitutes rules to follow.

**REVIEW OF PHONE SEARCH WARRANT EVIDENCE**

55. A Federal Search Warrant for the United States District Court for the Eastern District of Wisconsin was issued on January 4, 2013 for multiple cellular telephones in the captioned matter including, but not limited to, a Black Samsung Boostmobile cellular telephone, telephone number 414-234-3435, HEX A00002F1EAA92, which was recovered on August 22,

21

2012, during a consent search from Moore's vehicle. In addition, a consent form was signed by AV-1 to search iphone, telephone number 602-832-4999, which was recovered on August 22, 2012, from room 346 at the LaQuinta Hotel.

56.     As a result of the examinations of cellular telephones 602-832-4999 and 414-234-3435, photographs included in the Backpage advertisement of JV-1, which was posted on August 21, 2012, were found on the iphone, telephone number 602-832-4999, as well as the Samsung boostmobile cellular telephone, telephone number 414-234-3435. AV-1's cellular telephone number, which was also used by Casarez, was 602-832-4999, and 414-234-3435 was the cellular telephone number for Moore. Furthermore, on or about August 20, 2012, approximately five photographs, which appeared in the Backpage advertisement of JV-1, were sent from the iphone, telephone number 602-832-4999, to the Samsung boostmobile cellular telephone, telephone number 414-234-3435.

57.     Further, on the examination report for cellular telephone 414-234-3435, there were approximately 3,021 ingoing and outgoing SMS messages from October 29, 2011 to August 22, 2012. Multiple text messages were related to prostitution as evidenced by the sample of text messages below:

     a.  On May 12, 2012, an incoming text message was received on cellular telephone 414-234-3435, from telephone number 414-388-8926, which said: "You Feel Me? Am I On Yur Mind ? I Have THAT Feeling Again I Hope Yur Ok I Love Yu Daddy Najee Finesse ! <3"

     b.  On July 30, 2012, an outgoing text message was sent from cellular telephone 414-234-3435, to telephone number 573-586-8950, which said: "Hey sweetie this is chocolate you contacted me off backpage on my ad I was just returnig your call"

22

c.   On August 20, 2012, the following text message was received on cellular telephone 414-234-3435, from telephone number 414-639-0867, which said: "Hey honey how much for the both of you girls"

d.   Shortly thereafter, the following text message was sent from cellular telephone number 414-234-3435, to telephone number 414-639-0867, which said: "Hi itll be 200 roses for a hh"

e.   On August 21, 2012, an incoming text message was received on cellular telephone 414-234-3435, from telephone number 646-397-7785, which said: "Hey I saw ur ad on backpage. R u available?"

58.   The following contacts were saved in cellular telephone 414-234-3435: "Desi" was saved as 623-204-9458, and the number 602-832-4999 was saved as a name I know to be AV-1's nickname.

59.   On the examination report for cellular telephone 602-832-4999, there were approximately 1,133 ingoing and outgoing SMS messages from July 18, 2012 to August 25, 2012. Multiple text messages were related to prostitution as evidenced by the sample of text messages below:

a.   On August 21, 2012, the following text message was received on telephone number 602-832-4999, from telephone number 323-399-2902, which said: "Yo pimp called me"

b.   Shortly thereafter, the following text messages were sent from cellular telephone number 602-832-4999, to telephone number 323-399-2902, which said: "Wat u mean?" and "Wat dude say?"

c.   Telephone number 323-399-2902 responded with a text that said: "A nigga named twest asked if I was spending money"

d.   Telephone number 602-832-4999 responded with a text that said: "Finess? Idk a twest," and responded again with a text that said: "His name finess."

e.   On August 21, 2012, a text message was sent from telephone number 602-832-4999, to telephone number 414-324-0586, which said: "I'm drivin witt pimp (daddy) I will b when I can"

f.   On August 22, 2012, a text message was received on telephone number 602-832-4999, from telephone number 414-610-1211, which said: "How much for two girls-- http://mrnum.be/ru/5eiWT"

g.   The response from 602-832-4999 was: "200 1 hr"

h.   Telephone number 414-610-1211 texted back: "Are pictures real," and telephone number 602-832-4999 responded: "Yes who are u callin for," and telephone number 414-610-1211 texted: "Big juicy," and

i.   Telephone number 602-832-4999 texted back: "Okay how much time u looking fr"

60.    The examination report for 602-832-4999 showed that the telephone number 623-204-9458 was saved as a contact named, "Wifey!." I am aware that the term "wifey" is used by female prostitutes to refer to other female prostitutes, who are working for the same pimp. As stated above, Casarez said that her telephone number was 623-204-9458, which she stopped using approximately two months ago.

24

## REVIEW OF BACKPAGE ADVERTISEMENTS

61.     Pursuant to a subpoena, on or about February 7, 2013, several prostitution-related advertisements were received from Backpage associated with telephone numbers 414-234-3435 and 602-832-4999.  I believe that most of these advertisements are connected to Moore, Casarez, or both, because contact telephone numbers and email addresses are those used by Moore, Casarez, or by the females who prostituted for them.  Additionally, many of the same photographs listed in the advertisements were found on the examination reports for the Black Samsung Boostmobile cellular telephone, telephone number 414-234-3435, and the iphone, telephone number 602-832-4999.  Included below are examples of Backpage advertisements and invoices obtained from Backpage that are connected through photographs, contact telephone numbers, and email addresses:

> a.   A Backpage advertisement was posted on February 19, 2012, titled, "Let Us Relieve Your Stress !! – 22."  The invoice for this advertisement, dated, February 13, 2012, lists:  the Customer name as "Desirae. Casarez;" the email address as Lovely.desi@ymail.com; the address as 3869 north 24th place, Milwaukee, Wisconsin 53206; and the telephone number as 414-399-5773.  I know that Casarez's grandmother owned 3869 N. 24[th] Place address and Casarez frequently resided there.  In addition, two of the photographs on the advertisement appear to be photographs of Casarez.

> b.   On July 22, 2012, an advertisement was posted titled, "Double Trouble!! Sweet N Sexy!!- 21," with a telephone number of 623-204-9458 and a location of West Valley, Phoenix.  The invoices attached to the advertisement list the customer email as Lovely.desi@ymail.com.  As mentioned above, during an interview,

Casarez stated that her telephone number was 623-204-9458, which she stopped using approximately two months ago. Additionally, the location of West Valley, Phoenix is consistent with the time that Casarez and AV-1 were in Arizona.

    c.    On August 11, 2012, an advertisement was posted with the title, "TWO Sexy Chocolate Women ONE Flat Rate!!!! -21," with a telephone number of 602-832-4999 and a location of Chicago. The invoice attached to the advertisement lists the customer email address as Lovely.desi@ymail.com. As mentioned above, telephone number 602-832-4999, which was AV-1's telephone number for a white iphone and used by Casarez and Moore, was recovered on August 22, 2012 from the LaQuinta Hotel room 346.

    d.    On August 20, 2012, an advertisement was posted with the title, "Fun & Ready To Party !!!! -21," with a telephone number of 414-234-3435 and a location of Milwaukee. The invoices attached to the advertisement list a customer email address as Lovely.desi@ymail.com. As mentioned above, during an interview, Casarez stated that Moore's telephone number was 414-234-3435. Also, a black Boostmobile cellular telephone with a telephone number of 414-234-3435 was recovered from Moore's vehicle on August 22, 2012.

e. On August 21, 2012, an advertisement was posted of JV-1 with the title, "Fun & ready to party!!!!!  Kinky- 21," with a telephone number of 602-832-4999, and a location of "Milwaukee, Anywhere You Want Me."  The invoices attached to the advertisement list the customer user and email as lovely.desi@ymail.com.

Signature of Affiant
Shaughna B. Loncar, FBI Special Agent

Sworn to and subscribed before me
this 23rd day of April, 2013.

The Honorable William E. Callahan, Jr.

27